**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 19-cv-2808-WJM-NYW

DIANNA CHRISTINE MURPHY,

      Plaintiff,

v.

SCHAIBLE, RUSSO & CO., CPAs, LLP, and
THOMAS SCHAIBLE,

      Defendants.

---

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION TO DISMISS AND DENYING DEFENDANTS' MOTION TO
DISQUALIFY COUNSEL FOR PLAINTIFF**

---

This matter is before the Court on Defendants Schaible, Russo & Co., CPAs,

LLP ("SRC") and Thomas Schaible's ("Thomas") (together, "Defendants") Motion to

Dismiss Plaintiff's Amended Complaint Pursuant to Federal Rules of Civil Procedure

12(b)(1), 12(b)(2), and 12(b)(6) ("Motion to Dismiss") (ECF No. 51) and Defendants'

Motion to Disqualify Counsel for Plaintiff ("Motion to Disqualify") (ECF No. 22).  For the

reasons that follow, the Motion to Dismiss is granted in part and denied in part, and the

Motion to Disqualify is denied.

## I.  BACKGROUND

On December 23, 2019, Plaintiff filed her operative First Amended Complaint

with the Court, bringing a breach of fiduciary duty and fraud claim against Defendants

SRC and Thomas.  Plaintiff's allegations, which the Court accepts as true for limited

purposes,[1] are as follows.

Defendant Thomas is a certified public accountant ("CPA"), financial advisor, and the brother of Plaintiff's ex-husband, Michael Schaible.  (¶ 20.)[2]  From 1990 to 2017, Thomas provided CPA and financial-advising services to Plaintiff and Michael; from 1997 to 2017, Thomas was the registered representative on Plaintiff and Michael's joint investment and cash accounts.  In particular, Thomas managed and controlled Plaintiff and Michael's Securities Service Network ("SSN") investment accounts and Voya retirement account.  (¶ 28.)  Sometime after 1998, Thomas became a partner of SRC. (¶ 22.)  SRC holds itself out as providing a range of financial services, including accounting and tax services.  (¶ 26.)  Thomas is a resident of New Jersey, and SRC is a New Jersey limited liability partnership with its principal place of business in New Jersey.  (¶¶ 12, 14.)

The accounts Thomas managed for Plaintiff and Michael were funded primarily by earnings from Plaintiff and Michael's business interests, including the couple's real estate development partnerships, and a brokerage company that specialized in sales of high-end residential real estate in Los Cabos, Mexico.  (¶ 32.)

Around December 2016, Plaintiff and Michael began experiencing marital

---

[1] To the extent Defendants' Motion brings a Rule 12(b)(6) challenge, the Court will accept Plaintiff's allegations as true.  *See Hall v. Bellmon*, 935 F.3d 1106, 1109 (10th Cir. 1991).  However, because Defendants' Motion also makes jurisdictional challenges under Rules 12(b)(1) and (2), to the extent Plaintiff's allegations are inconsistent with facts set forth in Defendants' affidavits and other documentary evidence, Plaintiff's allegations will not necessarily be taken as true.  *See Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995).

[2] Citations to a paragraph number, *e.g.* (¶ __), without more, are to paragraphs in Plaintiff's First Amended Complaint (ECF No. 33).

difficulties.  At some point during that time, Michael told Plaintiff that he and Thomas

had a plan to make sure that, if Michael and Plaintiff got divorced, Plaintiff "would have

nothing."  (¶ 35.)

   In or around February 2017, Plaintiff instructed Thomas not to allow Michael to

make any rash decisions concerning the couple's investment accounts.  (¶ 40.)  On

March 22, 2017, Plaintiff sent Thomas an e-mail inquiring as to the possibility of

cashing out her and Michael's accounts, and distributing the couple's liquidated funds

evenly before a divorce filing.  (¶ 41.)  At the time of that e-mail, Plaintiff was at her and

Michael's residence in Cabo, "attempting to provide assistance to" Michael, apparently

in relation to what Plaintiff calls Michael's "severe personal problems."  (¶¶ 35, 42.)

Later that month, after an episode of domestic violence by Michael against Plaintiff,

Plaintiff left the Cabo residence and began driving home to Fort Collins, Colorado.

(¶ 44.)

   On March 30, 2017, while Plaintiff was driving from Cabo back to Fort Collins,

Michael requested that Thomas transfer approximately $2.5 million located in an SSN

account into the couple's joint bank account in Colorado.  (¶ 46.)  Thomas did so the

following day, without the knowledge and consent of Plaintiff.  (¶ 48.)  Shortly thereafter,

Michael transferred those funds into a bank account in Mexico to which Plaintiff does

not have access.  (¶¶ 3, 49.)  On April 7, 2017, Plaintiff e-mailed Thomas about the

status of her and Michael's accounts.  (¶ 50.)  Thomas did not reply to Plaintiff that day,

but he did forward her e-mail to Michael, writing, "Here we go . . . ."  (¶¶ 51–52.)

   On June 2, 2017, Plaintiff initiated divorce proceedings against Michael in

Larimer County District Court.  (¶ 60.)  Accordingly, pursuant to Colo. Rev. Stat. § 14-

10-107(b)(I), a temporary injunction went into effect that, among other things, "[r]estrain[ed] both parties from transferring, encumbering, concealing, or in any way disposing of, without the consent of the other party or an order of the court, any marital property[.]"  (¶ 61.)  And in November 2017, the divorce court temporarily enjoined Plaintiff or Michael from withdrawing funds from their joint accounts that were controlled by Thomas.  (¶ 63.)

Despite all of this, in January 2018, Thomas assisted Michael in the liquidation of another investment account.  Thomas cashed out the couple's Voya retirement account and sent the funds to the couple's bank account in Colorado.  Shortly thereafter, Michael quickly transferred those funds (approximately $750,000) to his bank account in Mexico.  (¶ 65.)

On January 31, 2019, the divorce court granted Plaintiff's petition for divorce, and entered various permanent orders.  (¶ 66.)  The divorce court ordered, among other things, that Plaintiff retain the couple's SSN accounts as her sole and separate property, and that Michael pay Plaintiff $8 million; specifically, the court ordered that Michael pay Plaintiff $2 million within seven days of the order, and the remaining $6 million in quarterly installments, with final payment due in January 2022.  (ECF No. 52 at 11.)  Michael to date has failed to make any of these payments to Plaintiff.  (¶ 68.)

Plaintiff contends that Thomas and SRC breached their fiduciary duties to Plaintiff and committed fraud in transferring funds from the SSN and Voya accounts without her knowledge and consent.  On January 15, 2020, Defendants filed a Motion to Dismiss (ECF No. 51), arguing that (1) the Court lacks personal jurisdiction over Defendants;  (2) Plaintiff's claims are not ripe; and (3) Plaintiff has failed to state a claim

for fraud or breach of fiduciary duty.  (ECF No. 51.)  On February 5, 2020, Plaintiff filed a Response (ECF No. 68), and on February 19, 2020, Defendants filed a Reply (ECF No. 71).[3]

Also at issue in this Order is Defendants' Motion to Disqualify (ECF No. 22). Defendants argue that Plaintiff's counsel, Baker & Hostetler LLP, should be disqualified from representing Plaintiff in this case because the firm is also currently representing Albert Russo, a partner at SRC, in another matter.  (*Id.*)  On December 23, 2019, Plaintiff filed a Response to Defendants' Motion to Disqualify (ECF No. 36), and on January 7, 2020, Defendants filed a Reply (ECF No. 49).

## II. LEGAL STANDARDS

### A.    Rule 12(b)(1) Motion to Dismiss

The purpose of a motion to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure is to test whether the Court has subject-matter jurisdiction to properly hear the case before it.  It may take one of two forms: a facial attack or a factual attack.  When reviewing a facial attack on a complaint pursuant to Rule 12(b)(1), the Court accepts the allegations of the complaint as true.  *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995).  When reviewing a factual attack on a complaint supported by affidavits and other documents, the Court makes its own factual findings and need not convert the motion to one brought pursuant to Rule 56.  *Id*. at 1003.

---

[3] On March 20, 2020, the Court ordered the parties to provide supplemental briefing as to whether Plaintiff has standing to seek the relief she requests (ECF No. 76).  The parties filed their respective supplemental briefs on March 31, 2020.  (ECF Nos. 77, 78.)

**B.**     **Rule 12(b)(2) Motion to Dismiss**

The purpose of a motion to dismiss under Rule 12(b)(2) is to determine whether the Court has personal jurisdiction over a defendant.  The plaintiff bears the burden of establishing personal jurisdiction, and may satisfy this burden by making a *prima facie* showing that personal jurisdiction over the defendants obtains.  *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008).  If the presence or absence of personal jurisdiction can be established by reference to the complaint, the Court need not look further.  *Id*.  The plaintiff, however, may also make this *prima facie* showing by putting forth evidence that, if proven to be true, would support jurisdiction over the defendant.  *Id*.  "[A]ny factual disputes in the parties' affidavits must be resolved in plaintiff's favor."  *Id*.

**C.**     **Motion to Disqualify**

A motion to disqualify counsel is committed to the sound discretion of the district court.  *FDIC v. Isham*, 782 F.Supp. 524, 528 (D. Colo. 1992).  The moving party carries the burden of establishing the grounds for disqualification.  *World Youth Day, Inc. v. Famous Artists Merch. Exch., Inc.*, 866 F. Supp. 1297, 1299 (D. Colo. 1994).  With exceptions not currently relevant, the District of Colorado applies the rules of professional conduct, as adopted by the Colorado Supreme Court, as the standard of professional responsibility applicable here.  D.C.COLO.LAttyR 2.

## III.  ANALYSIS

**A.**     **Personal Jurisdiction**

Defendants argue that the Court lacks personal jurisdiction over them.  The

Court disagrees.

"To obtain personal jurisdiction over a nonresident defendant, the plaintiff must show that jurisdiction is legitimate under the laws of the forum state and that the exercise of jurisdiction does not offend the due process clause of the Fourteenth Amendment." *Benton v. Cameco Corp.*, 375 F.3d 1070, 1075 (10th Cir. 2004). Colorado's long-arm statute confers personal jurisdiction to the maximum extent permitted by the Fourteenth Amendment. *Dudnikov*, 514 F.3d at 1070 (citing *Archangel Diamond Corp. v. Lukoil*, 123 P.3d 1187, 1193 (Colo. 2005)). Thus, the Court maintains personal jurisdiction over Defendants to the extent that doing so is consistent with due process. *Dudnikov*, 514 F.3d at 1070.

"[T]o exercise jurisdiction in harmony with due process, defendants must have 'minimum contacts' with the forum state, such that having to defend a lawsuit there would not 'offend traditional notions of fair play and substantial justice.'" *Dudnikov*, 514 F.3d at 1070 (quoting *Int'l Shoe Corp. v. Washington*, 326 U.S. 310, 316 (1945)). "A court may, consistent with due process, assert *specific* jurisdiction over a nonresident defendant if the defendant has purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities." *OMI Holdings, Inc. v. Royal Ins. Co. of Can.*, 149 F.3d 1086, 1090–91 (10th Cir. 1998) (internal quotation marks omitted; emphasis in original). A court may also exercise "general" personal jurisdiction over a defendant, where jurisdiction is not related to the events giving rise to the suit, if the defendant's "affiliations with the State are so continuous and systematic so as to render them essentially at home in the forum

State."  *Daimler AG v. Bauman*, 571 U.S. 117, 128 (2014) (internal quotation marks omitted).

Plaintiff does not contend that exercising general jurisdiction over Defendants would be proper—only that the Court may assert specific personal jurisdiction over Defendants in this matter.  Again, for the Court to maintain specific jurisdiction over Defendants, they must have "purposefully directed" their activities at the forum state, and Plaintiff's injuries must "arise out of" those activities.  *Dudnikov*, 514 F.3d at 1071.  "[T]he shared aim of purposeful direction doctrine" is "to ensure that an out-of-state defendant is not bound to appear to account for merely random, fortuitous, or attenuated contacts with the forum state."  *Id.*

1.    Thomas

The Court concludes that personal jurisdiction over Thomas is proper because, in setting the stage for Michael's transfer of the couple's funds to Mexico, Thomas took "intentional action . . . expressly aimed at [Colorado] . . . with knowledge that the brunt of the injury would be felt in [Colorado]."  *Id.* at 1072.

With respect to personal jurisdiction over Thomas, the instant case is analogous to *Dudnikov v. Chalk & Vermilion Fine Arts, Inc*, 514 F.3d 1063.  In *Dudnikov*, the plaintiffs, Colorado residents, were sellers of prints and fabrics on eBay.  *Id.* at 1067.  Two of the plaintiffs' prints played on famous images by an artist, the rights to which belonged to the defendant corporation, which was not a resident of Colorado.  *Id.*  Upon seeing that these prints were up for auction, the defendant contacted eBay in California and successfully suspended the plaintiffs' auction of those images.  *Id.*  The defendant

also threatened to sue the plaintiffs in federal court. *Id.* The case arose from the plaintiffs' suit against the defendant, seeking a declaratory judgment that their prints were not in violation of the defendant's copyrights. *Id.* The Tenth Circuit reasoned that exercising personal jurisdiction over the defendant was proper because, by causing eBay to suspend the plaintiffs' auction and by threatening the plaintiffs with a federal lawsuit, the defendant took intentional action expressly aimed at Colorado with the knowledge that the brunt of the plaintiffs' injuries would be felt in Colorado. *Id.* (citing *Calder v. Jones*, 465 U.S. 783, 789–90 (1984)).

Here, it is undisputed that Thomas intended to transfer the funds at issue to Colorado. And Thomas's actions were expressly aimed at Colorado: the funds were transferred to a bank account in Colorado, and the funds belonged in part to a Colorado resident. And at this stage of the proceedings, a reasonable inference can be drawn that Thomas knew any resulting injury to Plaintiff would be felt by her in Colorado, where she lives. Thus, under *Dudnikov*, Thomas has the requisite "minimum contacts" with Colorado.

"When a plaintiff satisfies the minimum contacts burden, the burden shifts to the defendant to demonstrate that exercising personal jurisdiction would nonetheless offend traditional notions of fair play and substantial justice." *Newsome v. Gallacher*, 722 F.3d 1257, 1271 (10th Cir. 2013). Defendants do not argue, however, that exercising personal jurisdiction over them would offend traditional notions of fair play and substantial justice. As such, because Thomas has the requisite minimum contacts with Colorado, the Court concludes that asserting personal jurisdiction over him is

9

proper.  *See id*.

      2.    <u>SRC</u>

Defendants also argue that, even if the Court may assert personal jurisdiction over Thomas, it may not do so as to SRC, because Thomas was not acting in his capacity as an agent of SRC when he transferred the funds at issue.  Thus, Defendants contend, Thomas's actions are not attributable to SRC, and jurisdiction over SRC accordingly does not lie.  For purposes of Defendants' Motion to Dismiss, the Court disagrees.

"[A] principal may be subject to the jurisdiction of the court because of the activities of its agent within the forum state" only if the agent's "acts are committed in the course of or within the scope of the agent's employment."  *Fireman Fund Ins. Co. v. Thyssen Min. Const. of Can., Ltd.*, 703 F.3d 488, 493–94 (10th Cir. 2012) (citing *Taylor v. Phelan*, 912 F.2d 429, 433 (10th Cir. 1990)).

In his affidavit, Thomas asserts as follows: Thomas operates his securities business "under the unincorporated entity name 'Schaible Russo Financial' ['SRF']." (ECF No. 51-1 at 2 ¶ 5.)  All of the securities products SRF offers are offered through SSN.  (*Id.*)  "SRC did not touch or manage the plaintiff's funds, and had nothing to do with" the transfers of funds at issue in this case.  (*Id.* at 3 ¶ 8.)  Thomas also asserts:

> The fact that SSN and SRC are entirely different entities providing different services, with SSN providing investment and money management services while SRC provides tax and accounting services, was disclosed and explained to [Plaintiff] in writing by the SSN Advisory, Inc. Agreement ["Agreement"] . . . that she and [Michael] signed when they opened their SSN accounts with me in 2007.

(*Id.* at 4 ¶ 11.)

As Thomas explains, the Agreement states that "some [SSN broker-dealers] are also properly licensed or qualified to offer" tax and accounting (among other) services. "All such services are offered independent of SSNAI and SSN."  (ECF No. 52-1 at 8.)  According to Defendants, the fact that tax and accounting services are not offered through SSN is proof that SRC does not offer securities products.

In her own affidavit, Plaintiff asserts that she "always communicated with [Thomas] using his SRC (tschaible@srccpa.net) e-mail address, called him using his SRC telephone number . . . , and met with him to discuss financial strategy at SRC's offices in New Jersey."  (ECF No. 68-1 at 3 ¶ 4.)  Indeed, the Court notes that Thomas's SRC e-mail address is listed on the front page of the Agreement.  (ECF No. 52-1 at 2.)  Moreover, the fact that *SSN* does not offer tax and accounting services is in no manner inconsistent with the possibility that *SRC* offers or offered *both* SSN products, as well as tax and accounting services.

At this stage of the proceedings, conflicts in the evidence must be resolved in favor of Plaintiff, who, additionally, need only make a *prima facie* showing of personal jurisdiction over Defendants.  *Dudnikov*, 514 F.3d at 1070.  This, in the Court's view, Plaintiff has done.

## B.    Standing

Defendants did not argue in their Motion to Dismiss that Plaintiff lacks standing to bring the claims asserted in the First Amended Complaint.  The Court, however, troubled in particular by whether Plaintiff had adequately alleged injury in fact, ordered

the parties to submit supplemental briefing as to the issue (ECF No. 76), and they did so (ECF Nos. 77, 78).

"The constitutional minimum of standing contains three elements." *Comm. to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 447 (10th Cir. 1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is both "concrete and particularized," and "actual or imminent." *Lucero*, 102 F.3d at 447. Second, the injury claimed must be "fairly traceable to the challenged action of the defendant," and third, "it must be likely that the injury will be redressed by a favorable decision." *Id.* "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561.

1.   Injury In Fact

The Court concludes that Plaintiff has plausibly alleged an injury in fact. The injury is in part an economic one: funds that Plaintiff had some right and ability to access and control prior to the events alleged in her complaint have, after Defendants' actions, from Plaintiff's perspective vanished. Plaintiff's ability to access what is partly her money has been extinguished, allegedly by the conduct of Defendants. This is a concrete and particularized infringement on Plaintiff's property rights that, in the Court's view, is sufficient to constitute an injury in fact for purposes of Article III.

Additionally, viewing Plaintiff's allegations in the light most favorable to her, the Court thinks it reasonable to infer that, but for Thomas's transferring of the funds, she would have been able to access such funds at an earlier time than she will now be able

12

to, if ever.  Accordingly, Plaintiff also suffers economic harm in the form of losing the time value of her money.  *See Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 457 (7th Cir. 2010) (Posner, J.).  While the Tenth Circuit has not spoken to whether the loss of time value of money can constitute an injury in fact, other federal courts have so held, and the Court finds the reasoning in those decisions to be persuasive.  *See id*.; *accord Dieffenbach v. Barnes & Noble, Inc.*, 887 F.3d 826 (7th Cir. 2018); *In re U.S. Office of Personnel Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42 (D.C. Cir. 2019); *Porsch v. LLR, Inc.*, 380 F. Supp. 3d 418 (S.D.N.Y. 2019); *Ensminger v. Credit Law Ctr., LLC*, 2019 WL 434125 (D. Kan. Sept. 30, 2018).

Defendants' arguments to the contrary are unavailing.  Defendants first assert that the divorce court took the SSN funds transferred by Thomas into consideration in ordering Michael to pay Plaintiff a sum of $8 million.  Consequently, Defendants argue, because the divorce court "already awarded [P]laintiff the balance of the SSN joint account, which is her equitable share of that account, [ ] she has not suffered an injury in fact as a result of the transfer."  (ECF No. 77 at 3.)

On the allegations, however, Plaintiff has suffered an economic loss at the hands of Thomas; the fact that *Michael* has been ordered to remedy such loss is of no moment.  No one would argue, for example, that a person would lack standing to sue their ex-spouse for failure to pay alimony simply because a court had previously ordered the ex-spouse to do so.  While Plaintiff would perhaps lack standing had Michael actually paid Plaintiff her equitable share of the wrongfully transferred funds, it is uncontested in this litigation that Michael has failed to make *any* payments to Plaintiff

13

pursuant to the divorce court's permanent orders.

Defendants further contend that "a temporary loss of control of a portion of a joint account does not rise to the level of concrete, particularized injury in fact, since [Plaintiff] may be made whole by the Divorce Order or the sale of jointly-owned real estate in Mexico." (*Id.*)  In other words, Defendants argue, because Michael may one day in the uncertain future comply with the divorce order, Plaintiff has not been injured. This is not a tenable argument.  If every federal court defendant being sued for damages could successfully argue that the plaintiff lacks standing because of the inchoate possibility that the amount sought may on some uncertain future date be voluntarily paid, federal suits for damages would not exist (or, defendants would always win).  And in any event, Plaintiff's allegations raise a more-than-speculative possibility that Michael will continue to refuse to pay.  Indeed, on the allegations of the operative complaint, it was Michael's intent that Plaintiff "have nothing."  (¶ 35.)

As to the funds transferred from the Voya account, Defendants assert that Plaintiff "never had control over the Voya annuity because, as the Voya annuity statements clearly show, it was owned by her husband individually.  Plaintiff cannot have lost control over an asset she never had control of to begin with."  (ECF No. 77 at 4.)  However, Defendants themselves concede that the divorce court "considered the Voya annuity's liquidation in its equitable distribution calculus when it rendered the $8 million award" to Plaintiff.  (*Id.*)  In other words, the divorce court considered the Voya funds *to be marital property*, to which Plaintiff is entitled to her equitable share.  As such, at this stage of the proceedings, the Court considers it plausible that, had Thomas not set the stage for the Voya funds to be transferred to Mexico, Plaintiff would

14

have access to her portion of those funds at an earlier point in time than she now will.

Thus, with respect to Plaintiff's injury in losing the time value of the Voya funds, whether Plaintiff had access to or control over those funds before Thomas's transfer is immaterial.  Moreover, as Plaintiff points out, she is listed as the primary beneficiary of the Voya account.  (ECF No. 78-8 at 4.)  As such, viewing Plaintiff's allegations in the light most favorable to her, a reasonable inference can be made that Plaintiff had a similar degree and manner of access to and control over the Voya funds as she did with respect to the SSN funds.

Finally, apart from the economic aspect of Plaintiff's injury, Plaintiff has plausibly alleged that Defendants caused her emotional distress, which, under Colorado law, is a legally cognizable injury stemming from a breach of fiduciary duty.  *See Moses v. Diocese of Colo.*, 863 P.2d 310, 322–23 (Colo. 1993); *cf. Boatright v. Derr*, 919 P.2d 221 (Colo. 1996); *Aller v. Law Office of Carole C. Schriefer, P.C.*, 140 P.3d 23, 27–28 (Colo. App. 2005).[4]  The emotional distress caused by Thomas's actions certainly is a concrete and particularized injury, and because it is also a legally cognizable injury

---

[4] In *Aller*, a division of the Colorado Court of Appeals held that non-economic damages could not be recovered on a breach of fiduciary duty claim by a client against a former attorney. 140 P.3d at 27–28.  The court reasoned that, because a breach of fiduciary claim against an attorney is essentially a legal malpractice (*i.e.*, a negligence) claim, and because non-economic damages cannot be recovered in the latter, the same rule should apply to the former.  *Id.*  The Court does not find this reasoning to apply to the instant case in such a way as to make non-economic damages unavailable to Plaintiff.  Among other reasons, an attorney-client relationship is a unique kind of fiduciary relationship, and the nature of Plaintiff's claim is much different than that of the plaintiff in *Aller*: Plaintiff does not argue that Defendants breached their fiduciary duty by being negligent, but rather that they abused their position of trust with intent and knowledge of the likely consequences.  (¶ 54.)  In this respect, therefore, the Court concludes the case at bar to be more akin to *Moses*, where the Colorado Supreme Court upheld an award of non-economic damages on a breach of fiduciary duty claim.  863 P.2d at 322–23.

under these circumstances, it is sufficient to constitute injury in fact.  *See Lujan*, 504 U.S. at 560.

      2.   <u>Causation</u>

"The traceability of a plaintiff's harm to the defendant's actions need not rise to the level of proximate causation" applicable in the tort context.  *Habecker v. Town of Estes Park, Colo.*, 518 F.3d 1217, 1225 (10th Cir. 2008); *see also* Wright & Miller, *Federal Practice & Procedure* § 3531.5 n.21 ("Traceability does not require that the defendants be the only cause of the injury.").  To be sure, Plaintiff's economic injury would not have occurred but for the actions of Michael, a non-party to this litigation.  The Court nonetheless concludes that, for purposes of Article III standing, Plaintiff's injury bears the requisite causal connection to Thomas's actions.

This case is materially different from a case like *Habecker v. Town of Estes Park, Colorado*, 518 F.3d 1217, where the Tenth Circuit held that the actions of third parties broke the chain of causation.  The dispute in *Habecker* arose from the plaintiff ("Habecker"), a former Trustee of the Board of Estes Park, Colorado, refusing to follow the practice of the Board to recite the Pledge of Allegiance before its meetings.  *Id.* at 1221.

In response to Habecker's refusal to recite the Pledge, private citizens started a petition to recall him from office.  *Id.*  The petition garnered enough signatures to mandate a recall vote, and Habecker was voted out of office.  *Id.*  Habecker argued that his being voted out of office was fairly traceable to the Board's insistence that members recite the Pledge, and the Tenth Circuit disagreed.  *Id.* at 1225.

The court stated that "[b]etween the actions of the defendants and [the plaintiff]'s ultimate removal from office lies an indispensable act by a third party not before the court: the votes cast by voters of the town of Estes Park." *Id.* Further:

> When the voters cast their ballots, the decision to vote for or against Habecker's recall was a purely private matter. We cannot, with any degree of certainty, know what considerations motivated the 903 individuals who chose to vote in favor of recalling Habecker. Any assumption in this regard would be a "speculative inference" insufficient to support causation.

*Id.*

In other words, because the court was left only to speculate on whether 903 voters voted to recall Habecker because of his failure to recite the Pledge, the Tenth Circuit held that evidence of causation was lacking.

On the allegations in the instant case, in contrast, there is no need to speculate on whether Michael's transfer of the funds to Mexico (the recall vote, by analogy) was caused by Thomas's transfer of the funds (the Board's practice of reciting the Pledge, by analogy). Thomas does not dispute that, but for his choice to transfer the funds to Colorado, Michael would not have been able to then transfer them to Mexico. As alleged, the actions of Thomas and Michael are intimately intertwined. This is so especially given the allegation that Thomas knew of Michael's intentions as to the transferred funds. (¶ 54.) The Court therefore concludes that Plaintiff's injuries are fairly traceable to Defendants' actions.

3.   Redressability

The redressability element of Article III standing plainly is met in this case. The Court can redress Plaintiff's injury by awarding her damages in the amount of her

equitable share of the funds that were transferred to Mexico.  Should Michael ultimately

pay Plaintiff pursuant to the divorce court's permanent orders, a Rule 60(b)(5)

amendment of judgment would likely be appropriate.  This does not mean, however, as

Defendants contend, that the Court cannot redress Plaintiff's alleged injuries.

## C.    Ripeness

Defendants further argue that Plaintiff's claims are not ripe.  The Court again

disagrees.

"The ripeness doctrine involves both constitutional requirements and prudential

concerns."  *United States v. Cabral*, 926 F.3d 687, 693 (10th Cir. 2019).  "[R]ipeness is

peculiarly a question of timing," *New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d

1495, 1498–99 (10th Cir. 1995), intended "to prevent the courts, through avoidance of

premature adjudication, from entangling themselves in abstract disagreements," *Abbott

Labs. v. Gardner*, 387 U.S. 136, 148 (1967).

Defendants argue that Plaintiff's claims will not ripen, if ever, until January 31,

2022, when the final installment of Michael's court-ordered payments is due.  This is an

argument Defendants also make with respect to Plaintiff's standing in this action, and it

appears to be an argument addressed toward the constitutional aspect of ripeness (*i.e.*,

whether Plaintiff's injury has, as of yet, sufficiently crystalized).  The Court finds this

argument to be unavailing.

As an initial matter, Defendants (serially) fail to acknowledge that the divorce

court ordered Michael to pay Plaintiff $2 million within seven days of its order, and the

remaining $6 million in quarterly installments, with the final installment to be paid on

January 31, 2022.  (ECF No. 52 at 11.)  As such, by the Court's own calculation, Michael is currently obligated to pay Plaintiff at least $3.25 million, with interest.  (*See id.*)  This undoubtedly covers the amount of the transferred funds to which she is entitled.  Thus, Defendants' argument that Plaintiff is not yet injured because Michael has not yet failed to satisfy his payment obligations to her fails on its own terms.  And in any event, for the reasons set forth in Part III.B.1 of this Order, the Court concludes that Plaintiff has already been injured.

Defendants further argue that Plaintiff will not suffer hardship if the Court refuses to entertain her claims, "because she has already taken possession of more than $5 million by virtue of her retention of the couple's multiple U.S.-based brokerage and bank accounts."  (ECF No. 51 at 10.)  Even if this is true, however, Defendants have not adequately presented arguments to the Court that this matter is, prudentially, unfit for judicial review.[5]  *See Cabral*, 926 F.3d at 693.  The Court therefore concludes that this case is ripe for adjudication.

**D.    Merits**

Defendants argue that Plaintiff has failed to state a claim both for breach of fiduciary duty and fraud.  The Court disagrees with respect to the former, but agrees with Defendants as to the latter.

1.    Breach of Fiduciary Duty

To succeed on her breach of fiduciary duty claim, Plaintiff must show that (1)

---

[5] Defendants include additional arguments as to prudential ripeness in their supplemental briefing.  (ECF No. 77 at 8–10.)  However, the Court did not grant Defendants leave to include such additional arguments (*see* ECF No. 76), and accordingly it will decline to consider them.

Thomas "was acting as a fiduciary to Plaintiff"; (2) Thomas "breached a fiduciary duty to the plaintiff"; (3) Plaintiff "incurred damages"; and (4) Thomas's "breach of fiduciary duty was a cause of the plaintiff's damages." *Graphic Directions, Inc. v. Bush*, 862 P.2d 1020, 1022 (Colo. App. 1993). The Court will analyze whether Plaintiff has plausibly alleged each of these elements in turn.

a. *Fiduciary Relationship*

A stockbroker/customer relationship is not *per se* a fiduciary relationship. *Paine, Webber, Jackson & Curtis, Inc. v. Adams*, 718 P.2d 508, 517 (Colo. 1986). Nevertheless, "proof of practical control of a customer's account by a broker will establish that the broker owes fiduciary duties to the customer with regard to the broker's handling of the customer's account." *Id.* "[E]vidence that the customer has placed trust and confidence in the broker, with the broker's knowledge, to manage the customer's account for the customer's benefit will be indicative of the existence of a fiduciary relationship." *Id.* at 518.

The Court believes it clear that Plaintiff has plausibly alleged the existence of a fiduciary relationship with Thomas in his capacity as the manager of her and Michael's investment accounts. Plaintiff alleges that Thomas had day-to-day control of the accounts at issue (¶ 79), and that in allowing Thomas to have such control, Plaintiff placed her trust in him (¶¶ 81–82). Also pointing to the existence of a fiduciary relationship here are the allegations of a personal relationship (former wife and brother-in-law) between Thomas and Plaintiff. *Adams*, 718 P.2d at 517. To the extent there are factors in this case that point to the lack of a fiduciary relationship, they are not

present on the face of the operative complaint.

      b.    *Breach of Fiduciary Duty*

"A broker's negligence in handling a discretionary account may give rise to a breach of the broker's fiduciary duty to use reasonable care and to use the skills and diligence necessary to protect the client's interests."  *Rupert v. Clayton Brokerage Co. of St. Louis, Inc.*, 737 P.2d 1106, 1110 (Colo. 1987).  Moreover:

> [I]f the stockbroker knows of facts and circumstances which would lead an ordinary careful and diligent person to believe that one joint tenant of a joint brokerage account was in the process of wrongfully converting to his own uses and purposes the interest of the other joint tenant, a duty to inform the latter would arise, and in such case the broker would be derelict in disbursing the whole account to the joint defendant under suspicion, without first informing the other and obtaining consent and approval to the disbursement.

*Leuzinger v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 396 S.W.2d 570, 576 (Mo. 1965).

In the Court's view, there can be no question Plaintiff has plausibly alleged that Defendants breached their fiduciary duties to her.  Plaintiff alleges that Thomas transferred the relevant funds to a bank account in Colorado, knowing that it was Michael's intention to then transfer those funds to Mexico, where the funds would be inaccessible to her.  If negligent handling of an investment account can constitute a breach of fiduciary duty, *Rupert*, 737 P.2d at 1110, intentional action that manifestly is harmful to the interests of one of the account's joint tenants *a fortiori* can as well.

      c.    *Causation*

The element of causation in breach of fiduciary duty claims "is satisfied when the

plaintiff proves that the defendant's conduct was a substantial contributing cause of the injury." *Aller*, 140 P.3d at 26. "If the defendant's conduct is a substantial contributing cause of the injury, it is irrelevant to the causation analysis whether other factors . . . also contributed to the injury." *Rupert*, 737 P.2d at 1112. The Court concludes that Plaintiff has plausibly alleged Thomas's actions were a substantial contributing cause of her injuries.

       d.   *Damages*

For the reasons set forth in Part III.B.1 of this Order, the Court concludes that Plaintiff has plausibly alleged that she has suffered both economic and non-economic damages.

       2.   <u>Fraud</u>

To survive Defendants' Motion to Dismiss as to her fraud claim, Plaintiff must allege that Defendants made a "misrepresentation, which is a false or misleading statement that induces the recipient to act or refrain from acting." *Brodeur v. Am. Home Assur. Co.*, 169 P.3d 139, 153 (Colo. 2007). While Plaintiff alleges that Thomas "concealed material facts from Plaintiff regarding the scheme" to transfer the funds (ECF No. 33 at 25 ¶ 102), she does not endeavor to explain how this alleged misrepresentation induced her to act or refrain from acting, nor what action Thomas caused her to take or not take. This failure is fatal to Plaintiff's fraud claim, especially in light of the rule that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252 (10th Cir. 1997).

Case 1:19-cv-02808-WJM-NYW   Document 82   Filed 04/28/20   USDC Colorado   Page 23 of 24


E.     **Motion to Disqualify**

Defendants argue that Plaintiff's counsel, Baker & Hostetler LLP ("Baker"),

violates Rule 1.7 of the Colorado Rules of Professional Conduct ("CRPC") by

representing Plaintiff in this matter, and therefore that the firm should be disqualified

from doing so.

CRPC 1.7 generally prohibits an attorney or law firm from concurrently

representing a client who is adverse to another.  Defendants assert that Baker is

currently representing Albert Russo, who is one of two SRC partners (the other being

Thomas).  Defendants argue that a lawsuit against SRC constitutes one against Russo

for conflicts purposes, and therefore that Baker's representation of Plaintiff in this case

constitutes a law firm suing its own client in violation of CRPC 1.7.

The following facts are undisputed.  Baker has represented the parent company

of SSN, Ladenburg Thalmann Financial Services Inc. ("Ladenburg"), since July 2018.

(ECF No. 34 at 3.)  In August 2019, Ladenburg notified its insurer of an SSN-related

"cyber event" involving Russo's SSN e-mail account (the "Ladenburg Engagement").

(*Id.* at 4.)  Ladenburg engaged Baker to represent it in the Ladenburg Engagement.

(*Id.*)  During Baker's representation of Ladenburg, Baker attorneys had some contact

with Russo, such that an attorney-client relationship between Baker and Russo may

have been created.  (*Id.*)

However, on October 14, 2019, after SRC was served with the original complaint

in the instant case (and apparently due to Russo's urging), Baker was terminated from

the Ladenburg Engagement.  Accordingly, it seems clear that, to the extent Baker ever

had an attorney-client relationship with Russo, it does not anymore.  As such, there can

be no violation of Rule 1.7.  While the applicable rule here appears to be Rule 1.9

(which addresses conflicts involving former clients)—not 1.7—Defendants do not argue

in its Motion to Disqualify that Baker's representation of Plaintiff constitutes a violation

of Rule 1.9.  (*See* ECF No. 22.)  The Court will not construct arguments on Defendants'

behalf, and Defendants' Motion to Disqualify will be denied.  *See Utahns for Better*

*Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1175 (10th Cir. 2002).

## IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.    Defendants' Motion to Dismiss (ECF No. 51) is GRANTED as to Plaintiff's fraud

       claim, and that claim is dismissed without prejudice;

2.    Defendants' Motion to Dismiss is DENIED in all other respects;

3.    Defendants' Motion to Disqualify Counsel for Plaintiff (ECF No. 22) is DENIED;

       and

3.    The Magistrate Judge shall set this matter for a Scheduling Conference as soon

       as is practicable, as this matter remains pending as to Plaintiff's breach of

       fiduciary duty claim against both Defendants.

Dated this 28th  day of April, 2020.

BY THE COURT:

William J. Martinez
United States District Judge

24