**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 19-cv-2808-WJM-NYW

DIANNA CHRISTINE MURPHY,

      Plaintiff,

v.

SCHAIBLE, RUSSO & COMPANY, C.P.A.'S, LLP, and
THOMAS SCHAIBLE,

      Defendants.

---

**ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT AND GRANTING IN
PART AND DENYING IN PART DEFENDANT'S MOTION TO EXCLUDE TESTIMONY**

---

This matter is before the Court on the following motions:

1.    Defendant Schaible, Russo & Company, C.P.A.'s LLP's ("SRC") Motion

for Summary Judgment ("SRC's Motion") (ECF No. 147);

2.    Defendant Thomas Schaible's Motion for Summary Judgment ("Schaible's

Motion") (ECF No. 149); and

3.    Defendant Thomas Schaible's Motion to Exclude Testimony of Plaintiff's

Expert Witness William Fender ("702 Motion") (ECF No. 181).

For the reasons explained below, the Motions for Summary Judgment are

denied, and the 702 Motion is granted in part and denied in part.

## I. BACKGROUND

**A.    Factual Allegations**[1]

1.    <u>Thomas Schaible</u>

Thomas Schaible is an investment advisor registered with the U.S. Securities and Exchange Commission ("SEC") pursuant to the Investment Advisers Act of 1940, a registered representative licensed with the Financial Industry Regulatory Authority ("FINRA") to buy and sell securities, and a licensed certified public accountant.  (ECF No. 145 at 6 ¶ 9; ECF No. 148 at 3 ¶¶ 2–3.)

During the relevant time period, Thomas Schaible served as a registered representative affiliated with the broker dealer Securities Service Network, LLC ("SSN"), as well as an advisor representative affiliated with SSN Advisory, Inc. ("SSN Advisory"), a registered investment advisor registered with the SEC.  (ECF No. 145 at 5 ¶¶ 1–2; ECF No. 148-11.)

Thomas Schaible and his business partner, Albert Russo, operated Schaible, Russo & Company, CPA's, L.L.P. ("SRC"), a New Jersey limited liability partnership engaged in tax preparation and accounting.  (ECF No. 145 at 6 ¶¶ 9–10.)  SRC is not a securities broker-dealer, a FINRA member, or a registered investment advisor with the SEC.  (*Id.* ¶ 11.)  Thomas Schaible and Russo also conducted at least some of their securities and investment advisory business as separate sole proprietorships under the marketing name "Schaible Russo Financial" ("SRF").  (ECF No. 148 at 5 ¶ 3.)

---

[1]  The following factual summary is based on the parties' briefs on SRC's Motion and Thomas Schaible's Motion, and documents submitted in support thereof.  All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs

2.     Thomas Schaible's Dealings with Plaintiff and Michael Schaible

Plaintiff and Michael Schaible, Thomas Schaible's brother, were married from

1990 until 2019.  (ECF No. 148 at 3 ¶ 13.)  The couple lived in Mexico from 1986 until

March 2017, when Plaintiff moved from Mexico to Colorado.  (*Id.* ¶ 14.)  Thomas

Schaible provided financial advisor and tax services to Plaintiff and Michael Schaible for

decades.  (ECF No. 164 at 4–5 ¶¶ 1, 4–5.)

On or about October 31, 2005, Plaintiff and Michael Schaible purchased the

Voya annuity for $750,000, which listed Michael Schaible as the owner of the annuity

and Plaintiff as its beneficiary.  (ECF No. 164 at 6 ¶¶ 16, 18.)

On September 12, 2007, Plaintiff and her then-husband, Michael Schaible,

signed a Client Advisory Services Agreement, which lists Plaintiff and Michael Schaible

as the clients and Thomas Schaible and Russo as Investment Advisor Representatives

("IAR") (the "Advisory Agreement").  (ECF No. 145-2 at 2.)  The Advisory Agreement

provides that the IAR will provide services relating to the "Investment Management of

Assets – no load mutual funds, stocks, bonds, and other investments."  (*Id.*)

The Advisory Agreement further states that:

> **Services to be Performed**.  The IAR agrees to consult with
> the Client for the purpose of acquiring information
> concerning the Client's assets, liabilities, present and
> foreseeable obligations, present and future income, Client's
> desired financial goals, and Client's tolerance for risk as well
> as other data related to the foregoing. . . .
>
> **Confidentiality**.  All information and recommendations
> furnished by either Client or Advisor and its IARs to the other
> shall at times be treated in strict confidence and shall not be

from a document's internal pagination.

> disclosed to third persons . . . .
>
> **Joint and Several Obligations.**  In the event that more than one (1) person executes this Agreement as Client, each person signing as Client agrees to be jointly and severally bound by each obligation assumed by the Client hereunder. In addition, the IAR may act upon instructions from any account holder.

(*Id.* at 3–4, 9.)

In 2015, Plaintiff and Michael Schaible signed standing payment instructions for bank wires to the couple's joint bank account held at First Bank of Vail.  (ECF No. 148-16 at 2.)  These instructions authorize National Financial Services LLC ("NFS") "to act upon your and/or your Broker/Dealer's requests to distribute funds or transfer cash or securities from your brokerage account to the designated bank or other brokerage accounts above in accordance with the instructions given by you and/or your Broker/Dealer to NFS without [NFS] confirming those instructions with you directly."  (*Id.* at 5.)

By March 2017, the couple's joint brokerage account balance was approximately $7 million.  (ECF No. 148 at 9 ¶ 56.)

3.  Dissolution of Plaintiff's Marriage & Michael Schaible's Asset Transfers

Plaintiff asserts that in December 2016, Michael Schaible began having emotional issues and that she reached out to Thomas Schaible for his assistance. (ECF No. 148 at 6 ¶¶ 33–34.)

On February 24, 2017, Plaintiff sent Thomas Schaible an e-mail in which she stated,

> . . . In the mean time [*sic*] it is important that you know that Mike is at the extreme level of instability his motives actions

4

> and every other moment of each and every day are
> unpredictable and without any reality and filled with lies.  I
> worry about our future as I believe he will do everything he
> can to destroy it.  So please do not allow him to make any
> irrational financial decisions[.]  That is I believe the only thing
> you really can do to help Mike, me and the kids.  [A]nd that is
> a lot to ask I know.  Dr. Jekyl and Mr. Hyde are in full control
> of Mike now.

(ECF No. 148-18 at 3.)

On March 11, 2017, Michael Schaible asked Thomas Schaible questions regarding cashing out the Voya annuity.  (ECF No. 165-12 at 3.)  Thomas Schaible provided Michael Schaible with an explanation regarding a $1.195 million buyout offer for the Voya annuity, including the potential tax implications.  (*Id.* at 2; ECF No. 164 at 13 ¶ 68.)  Thomas Schaible wrote, "[i]n my opinion, it makes sense to accept the offer and roll it to a new low[-]cost annuity."  (ECF No. 165-12 at 2.)

On March 15, 2017, Plaintiff e-mailed Thomas Schaible a list of her and Michael Schaible's joint assets, stating, "I am wondering thought [*sic*] the process for separating our interest in terms of [V]oya mutual funds and cash?"  (ECF No. 165-13 at 2.) Thomas Schaible did not respond to Plaintiff.  (ECF No. 164 at 13 ¶ 71.)

On March 22, 2017, Plaintiff sent Thomas Schaible another e-mail, in which she stated that she has "figured out so far that is much more beneficial for mike and [her] to distribute [their U.S.] assets mutually before any kind of filing."  (ECF No. 148-24 at 2.) She wrote,

> my silly question to you is can I not just request that you
> distribute our mutual fund accounts cash and (my personal
> decision would be best if we) cash out the [V]oya and send
> 50% towards each?  I was just wondering if am empowered
> to request such?  Do I have any access to request small
> amounts of dinero?  [N]ever had to before so don't really

know the rules.   :0)

Also I was wondering if you are interested in maintaining my
accounts and such as an individual?  I understand
completely that it is potentially uncomfortable for you.  Not
for me Bro.  But should you prefer not could let me know
how that transition would take place?  I have always deeply
appreciated your guidance and investment advice.

I reached out to our [F]ort [C]ollins bank.  First National Bank
for cash management advice but you have always given me
the best seems strange to look further.

(*Id.*)  Thomas Schaible again did not respond to Plaintiff.  (ECF No. 164 at 14 ¶ 73.)

On March 30, 2017, Michael Schaible sent an e-mail to Thomas Schaible stating,

"I really need all the mails from [Plaintiff] to you guys.  Including those she sent calling

for you to have me 'institutionalized.' . . . She is not well and I do not agree that she can

simply, unilaterally decide to walk away and dictate terms."  (ECF No. 165-15 at 2.)  He

also asked Thomas Schaible about the tax consequences of liquidating all of the

investments held in the couple's joint SSN brokerage account.  (ECF No. 164 at 14

¶ 77; ECF No. 165-16 at 2.)  The next day, Thomas Schaible forwarded Michael

Schaible Plaintiff's March 15 and March 22, 2017 e-mails.  (ECF No. 148-24; ECF No.

164 at 15 ¶ 78; ECF No. 165-13.)

On March 31, 2017, Michael Schaible instructed Thomas Schaible to submit his

instructions to SSN to transfer $2.5 million from his and Plaintiff's joint SSN brokerage

account to the First Bank of Vail joint account identified in the couple's written Standing

Payment Instructions.  (ECF No. 148 at 8 ¶ 49.)  The funds were transferred on April 3,

2017.  (ECF No. 145-5 at 2.)

On April 7, 2017, Plaintiff e-mailed Thomas Schaible again:

> Can you please tell me what money movements or
> transactions have been made since we last spoke and the
> current status of our accounts?  I am in Colorado as you and
> so many others suggested.  I have spoken to a financial
> planner, as I did not really get a response from you, so I am
> prepared to be able to have someone manage my funds and
> cash management on this end.  Mike is not communicating
> on any real basis with me but I mentioned before regardless
> of our issues [sic] have my fiscal house in order.  Tax filing is
> coming up, I will give you contact info (and I am sure a list of
> questions) for my agent and I appreciate your full
> cooperation with them.  I would like to provide as much info I
> can so they can file properly.  (and I don't seem stupid)  As
> you know it is my intention to have my 50% of our cash,
> funds, and [V]oya and any other US stuff recognized
> individually. . . .
>
> Tom you have taken care of my finances and I have always
> had so much confidence and peace of mind knowing that.

(ECF No. 165-19 at 10–11.)  Thomas Schaible forwarded this e-mail to Michael

Schaible on April 7, 2017, writing, "Here we go…."  (ECF No. 165-3 at 2.)

On the same day, Thomas Schaible responded to Plaintiff's e-mail, writing, *inter*

*alia*,

> My suggestion with you going back to Colorado was to be
> near your children and to spend some time to regroup and
> seek the counseling you seem to need not to head down the
> road of splitting everything up and legally separating or
> divorcing.  You can have your new accountant contact me
> but I don't see a great need for you to have to file anything.

(ECF No. 165-18 at 2.)  He also sent Plaintiff the log-in instructions to view the account

activity in her joint account.  (ECF No. 165-19 at 6.)

On April 11, 2017, Plaintiff sent Michael Schaible an e-mail regarding the division

of their U.S. assets.  (ECF No. 165-21 at 3.)  Michael Schaible forwarded the e-mail to

Thomas Schaible, stating:

> She is not well and clearly hasn't got a clue.  There will be
> no division of anything between Dianna and I.
>
> . . .
>
> I would ignore her.  Any division of cash or assets will be the
> resort of divorce settlement in Mexico and it certainly will not
> include any even division of these funds. . . .

(*Id.* at 2.)  Thomas Schaible responded to Michael Schaible, writing, "[t]hought as

much."  (*Id.*)

On May 17, 2017, Plaintiff e-mailed Thomas Schaible and copied Michael

Schaible, asking that Thomas Schaible divide the assets under his management.  (ECF

No. 165-22.)  Among other things, she wrote:

> I became aware inadvertently [*sic*] of the over 2 million dollar
> cash transfer to the Vail account and subsequent transfer,
> (the next day I think) to Mike's personal account in Mexico.
> (mike and I have never had joint account in Mexico and have
> absolutely never discussed this).  50% of this amount needs
> to be considered in the distribution in some way.  Cash or
> equivalent.
>
> . . .
>
> The Voya fund I assume is not transferable so the 50% of
> the cash value amount (the last info I have) should be
> reflected in cash or actions in the transfer to Cornerstone.
>
> . . .
>
> Tom.  Now that Mike has zeroed our checking account left
> nothing in the US and has harmed me in every way
> financially I am living off of credit cards that he will not pay.
> [S]o I am hoping this transfer takes place efficiently and
> immediately so that I can exist. . . .

(*Id.* at 2–3.)  Thomas Schaible later forwarded this e-mail to Michael Schaible's divorce

attorney.  (ECF No. 165-27 at 2.)

Plaintiff filed for divorce from Michael Schaible in June 2017.  (ECF No. 148 at 10 ¶ 69.)

On August 22, 2017, Thomas Schaible sent Michael Schaible an e-mail explaining the tax consequences of liquidating the remaining assets in the couple's joint brokerage account and of accepting the offer to buy out the Voya account.  (ECF No. 164 at 18 ¶ 104.)  He subsequently sent an e-mail to Michael Schaible and his divorce lawyer, suggesting, "We should bar [Plaintiff's counsel's brother] from being the new advisor for her.  Total conflict and loaded with problems."  (ECF No. 165-24 at 2.)

Thereafter, on December 1, 2017, Schaible withdrew as the financial advisor and registered representative of the couple's SSN joint brokerage account.  (ECF No. 148 at 10 ¶ 70.)  In the letter to the couple, Thomas Schaible wrote, "[t]his involves a change only in the representative assigned to the [SSN] account.  Your investments will not move, your account number will not change, nor will any investment decisions be made without both of your consent."  (ECF No. 145-6 at 2.)

On January 17, 2018, Michael Schaible sent a letter to Voya Insurance and Annuity Company, asking them to liquidate his Voya annuity.  (ECF No. 148-23.) Jennifer Bloodworth, an employee of SRC, notarized Michael Schaible's signature.  (*Id.* at 10.)  Thomas Schaible contends that he was out of the office on vacation when Michael Schaible requested liquidation of the Voya annuity and that Bloodworth acted on her own to notarize Michael Schaible's signature.  (ECF No. 148 at 11 ¶¶ 79, 81.)

## B.   Procedural History

Plaintiff initiated this action on October 1, 2019 pursuant to the Court's diversity jurisdiction, 28 U.S.C. § 1332, and filed the First Amended Complaint on December 23,

2019.  (ECF Nos. 1, 33.)  In the First Amended Complaint, Plaintiff asserts the following claims: (1) breach of fiduciary duty against SRC and Thomas Schaible (¶¶ 74–99)[2]; and (2) fraud against Thomas Schaible (¶¶ 100–04).

On January 15, 2020, Defendants filed a Motion to Dismiss (ECF No. 51), which the Court granted in part and denied in part on April 28, 2020 (ECF No. 82). Specifically, the Court dismissed Plaintiff's fraud claim without prejudice and denied the motion in all other respects.  (ECF No. 82 at 22.)

Defendants filed Thomas Schaible's Motion and SRC's Motion on October 16 and October 20, 2020, respectively.  (ECF Nos. 147, 149.)  Plaintiff responded to the motions on November 12, 2020 (ECF Nos. 164, 166), and Defendants replied on December 1, 2020 (ECF Nos. 179, 180).

On December 1, 2020, Thomas Schaible filed the 702 Motion.  (ECF No. 181.) Plaintiff responded on December 22, 2020 (ECF No. 198), and Thomas Schaible replied on January 5, 2021 (ECF No. 203).

### III. MOTIONS FOR SUMMARY JUDGMENT

**A.    Standard of Review**

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986).  A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim.  *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001).  An issue is "genuine" if

---

[2] Citations to (¶ __), without more, are references to the First Amended Complaint.

the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial.  *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## B.    Thomas Schaible's Motion

To establish a common law breach of fiduciary duty claim, a plaintiff must establish that: (1) the defendant was acting as a fiduciary of the plaintiff; (2) the defendant breached a fiduciary duty to the plaintiff; (3) the plaintiff incurred damages; and (4) the defendant's breach of fiduciary duty was a cause of the plaintiff's damages. *Sewell v. Great N. Ins. Co.*, 535 F.3d 1166, 1172 (10th Cir. 2008).

Thomas Schaible argues that Plaintiff's common law breach of fiduciary duty claim must be dismissed for numerous reasons: (1) the claim is preempted by the National Securities Markets Improvement Act of 1996 ("NSMIA"), 15 U.S.C. § 77r, and/or state laws governing joint accounts; (2) Thomas Schaible's actions were required by the UCC, relevant banking laws, securities laws, and/or SSN's written supervisory procedures; and (3) Thomas Schaible was not involved in the liquidation of the Voya account.  (ECF No. 148.)  The Court analyzes each argument below.

---

(ECF No. 33.)

1.   Preemption

"The Supreme Court's jurisprudence under the Supremacy Clause of the United States Constitution identifies both express and implied forms of federal preemption, which are 'compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose.'"   *Blue Circle Cement, Inc. v. Bd. of Cnty. Comm'rs of Cnty. of Rogers*, 27 F.3d 1499, 1504 (10th Cir. 1994) (quoting *Gade v. National Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992)).   As the *Gade* court explained,

> Absent explicit pre-emptive language, we have recognized at least two types of implied preemption: field pre-emption, where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it, and conflict pre-emption, where compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

555 U.S. at 98 (internal citations and quotation marks omitted).

"[I]n all pre-emption cases, and particularly in those in which Congress has 'legislated . . . in a field which the States have traditionally occupied,' . . . we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quoting *Medtronic, Inc. v. Lohr*, 470, 485 (1996)).

Thomas Schaible argues that Plaintiff's common law breach of fiduciary claim is expressly preempted by Sections 203A and 222 of NSMIA, codified at 15 U.S.C. § 80b-3a(b)(1)(A) and 15 U.S.C. § 8b-18a, respectively.   (ECF No. 148 at 15–16.)

Under Section 203A:

No law of any State or political subdivision thereof requiring the registration, licensing, or qualification as an investment adviser or supervised person of an investment adviser shall apply to any person--

(A) that is registered under section 80b-3 of this title as an investment adviser, or that is a supervised person of such person, except that a State may license, register, or otherwise qualify any investment adviser representative who has a place of business located within that State.

15 U.S.C. § 80b-3a(b)(1)(A).

Section 222 provides:

No law of any State or political subdivision thereof requiring the registration, licensing, or qualification as an investment adviser shall require an investment adviser to register with the securities commissioner of the State (or any agency or officer performing like functions) or to comply with such law (other than any provision thereof prohibiting fraudulent conduct) if the investment adviser--

(1) does not have a place of business located within the State; and

(2) during the preceding 12-month period, has had fewer than 6 clients who are residents of that State.

15 U.S.C. § 80b-15a(d).

Thomas Schaible argues that he "is an investment adviser representative registered with the SEC, and subject to the fiduciary standards set forth in the Investment Advisers Act of 1940."  (ECF No. 148 at 16.)  He contends that the "SEC comprehensively regulates every aspect of a Registered Investment Adviser's business," and that Plaintiff's common law breach of fiduciary duty claim is both "expressly preempted by NSMIA" and impliedly preempted on the basis that the

Investment Advisers Act of 1940 "bespeaks a comprehensive federal regulatory scheme over Registered Investment Advisers and which expressly prohibits state regulation of them."  (*Id.* at 17–18.)

Critically, however, Thomas Schaible cites no binding authority holding either that NSMIA preempts common law fiduciary duty claims or that Congress intended to preempt state fiduciary duty claims.  (*See* ECF No. 148.)  Nor can the Court draw such a conclusion from the statutes' language.  After all, sections 203A and 222 of NSMIA address registration, licensing, and qualification of investment advisors, as well as their compliance with state laws.  Neither provision expressly nor impliedly manifests a congressional intent to preempt common law claims for breaches of fiduciary duty.  Moreover, Thomas Schaible has failed to demonstrate that Plaintiff's common law claim actually conflicts with federal law.

Accordingly, this portion of Thomas Schaible's Motion is denied.

2.    The March 31, 2017 Withdrawal Request

Thomas Schaible argues that he is entitled to summary judgment because he was required to comply with Michael Schaible's March 31, 2017 request to transfer $2.5 million from Michael Schaible and Plaintiff's joint account.  (ECF No. 148 at 19–30.)  For support, he argues that the terms of the Advisory Agreement, Plaintiff and Michael Schaible's written standing payment instructions, and SSN's written supervisory procedures concerning wire transfers required him to initiate the $2.5 million transfer based on Michael Schaible's instructions; he also argues that Colorado and other case law recognizes the authority of either of multiple joint account holders to make withdrawals from their joint account.  (*Id.* at 21–23 (citing *Estate of Barnhart*, 574 P.2d

500 (Colo. 1978) (en banc); *Westfall v. Westfall*, 942 P.2d 1227 (Colo. App. 1996);

*Knight v. Lancaster*, 988 S.W.2d 172 (Tenn. Ct. App. 1998); *Leuzinger v. Merrill Lynch*

*Pierce Fenner & Smith, Inc.*, 396 S.W.2d 570 (Mo. 1965) (en banc)).)  According to

Thomas Schaible, "[t]hese authorities collectively establish that Michael [Schaible] had

the right to remove funds from the joint account" and that it follows that "Schaible was

required to act upon those instructions."  (*Id.* at 22.)

He further argues that, pursuant to the UCC and Colorado banking law, he was

required to comply with Michael Schaible's transfer request.[3]  (ECF No. 148 at 19–21

(citing Colo. Rev. Stat. §§ 4-8-507(a)[4], 11-105-105[5]).)

---

[3] Thomas Schaible argues that Tennessee law applies because the Advisory Agreement states that "[t]his Agreement is governed by the laws of the State of Tennessee, which is where [Securities Service Network Advisory, Inc.] is located, and applicable federal law."  (ECF No. 148 at 19.)  However, as Plaintiff points out, the Advisory Agreement "says nothing about tort claims and that agreement does not extend to other aspects of their fiduciary relationship, like tax advice."  (ECF No. 166 at 26.)  As a federal court exercising diversity jurisdiction, the Court applies Colorado's choice of law provisions, which require that tort claims be analyzed pursuant to the law of the state that has the most significant relationship to the occurrence.  *AE, Inc. v. Goodyear Tire & Rubber Co.*, 168 P.3d 507, 508 (Colo. 2007) (en banc).  Because Thomas Schaible assisted Michael Schaible with the $2.5 million transfer to a bank account in Colorado resident and the funds belonged in part to a Colorado resident, the Court finds that Colorado—not Tennessee—has the most significant relationship to the occurrence.  In drawing this conclusion, the Court notes that neither Thomas Schaible nor SRC argue that another state has a more significant relationship to this action than Colorado.  (*See* ECF Nos. 145, 148.)  Accordingly, the Court will analyze Plaintiff's breach of contract claim under Colorado law and will analyze the Colorado versions of the UCC.

[4] Under Colorado Revised Statute § 4-8-507(a),

> A securities intermediary shall comply with an entitlement order if the entitlement order is originated by the appropriate person, the securities intermediary has had reasonable opportunity to assure itself that the entitlement order is genuine and authorized, and the securities intermediary has had reasonable opportunity to comply with the entitlement order.  A securities intermediary satisfies the duty if:

Plaintiff responds that these statutes do not apply to Thomas Schaible's "breaches of fiduciary duty by knowingly transferring cash—as opposed to securities— out of the account to the known/intentional detriment to a fiduciary" and that neither the Standing Payment Instructions nor the Advisory Agreement authorize Thomas Schaible to act in a manner that breaches his fiduciary duties to Plaintiff.  (ECF No. 166 at 27–28.)

After careful review, the Court finds Thomas Schaible's arguments unavailing and concludes that there are material factual disputes regarding whether Thomas Schaible owed fiduciary duties to Plaintiff and whether he breached those duties.  As Plaintiff points out, Thomas Schaible has not clearly demonstrated that sections 4-8-507(a) and 11-105-105 apply to a request that an investment advisor transfer *cash* from a joint account.[6]  (ECF No. 166 at 27.)  Likewise, neither the terms of the Standing

---

(1) The securities intermediary acts with respect to the duty as agreed upon by the entitlement holder and the securities intermediary; or

(2) In the absence of agreement, the securities intermediary exercises due care in accordance with reasonable commercial standards to comply with the entitlement order.

[5] Pursuant to Colorado Revised Statute § 11-105-105, ". . . when a bank deposit in any bank transacting business in this state is made in the names of two or more persons payable to them or to any of them, such deposit, or any part thereof or interest thereon, may be paid to any one of said persons whether the others are living or not, and the receipt or acquittance of the person so paid shall be valid and sufficient discharge to the paying bank from all said persons and their heirs, executors, administrators, and assigns . . . ."

[6] The Court is also unpersuaded by Thomas Schaible's argument that the UCC abrogates Plaintiff's common law breach of fiduciary duty claim.  (ECF No. 148 at 24–27.)  As the Supreme Court of Colorado has recognized, "[i]n adopting the Uniform Commercial Code, the General Assembly has expressly indicated its intent that preexisting principles of law and equity have continuing vitality and be treated as supplementing the code, unless they have been 'displaced' by any of its particular provisions."  *Clancy Sys. Int'l, Inc. v. Salazar*, 177 P.3d 1235, 1237 (Colo. 2008) (en banc) (quoting Colo. Rev. Stat. § 4-1-103).  Thomas Schaible has not

Payment Instructions nor the Advisory Agreement excuse Thomas Schaible from his fiduciary duties to Plaintiff.  The cases cited by Thomas Schaible are also distinguishable because they do not involve an individual knowingly taking steps to the detriment of a party to whom he owes fiduciary duties.  *See, e.g.*, *Estate of Barnhart*, 574 P.2d at 508; *Westfall*, 942 P.2d at 1228–29; *Knight v. Lancaster*, 988 S.W.2d at 176–77; *Leuzinger*, 396 S.W.2d at 576–77.

However, even if the Court agreed with Thomas Schaible's arguments that he was obligated to comply with Michael Schaible's March 31, 2017 transfer request, he would still not be entitled to summary judgment at this juncture.  A review of the record demonstrates that there are significant factual disputes regarding the scope of the fiduciary duties that Thomas Schaible owed to Plaintiff, and whether he breached those fiduciary duties with regard to the March 31, 2017 transfer.

For example, Plaintiff has presented evidence regarding the practical control that Thomas Schaible exercised over the couple's investment accounts and the trust and confidence that Plaintiff placed in him, giving rise to a fiduciary relationship.  (ECF No. 165-3 at 2 (Plaintiff informs Thomas Schaible that "you have taken care of my finances and I have always had so much confidence and peace of mind knowing that").)  *See Paine, Webber, Jackson & Curtis, Inc. v. Adams*, 718 P.2d 508, 517 (Colo. 1986) (en banc) (determining that stockbrokers may owe fiduciary duties to their customers); *Johnston v. CIGNA Corp.*, 916 P.2d 643, 647 (Colo. App. 1996) (recognizing that "[i]n

provided any argument or case law demonstrating that Plaintiff's common law breach of fiduciary duty claim has been clearly displaced by any provision of the UCC.

general" investment advisors and financial planners owe fiduciary duties to his or her customers).

Those fiduciary duties may extend beyond the confines of financial transactions. As the Supreme Court of Colorado has recognized,

> [A] broker that has such a fiduciary relationship with its customer has wide-ranging duties in managing the customer's account in accordance with the customer's needs and objectives. The duties of a broker in a fiduciary status are not at an end when a transaction is completed; they include a continuing duty to keep abreast of financial information that may affect the customer's portfolio and to act on the basis of that information.

*Adams*, 718 P.2d at 515–16 (internal citations omitted).  Courts have further held that the scope of a fiduciary duty may include an obligation "not to disclose or otherwise misuse confidential information."  *Dolton v. Capitol Fed. Sav. & Loan Assn*, 642 P.2d 21, 24 (Colo. App. 1981); *see also Ramsey v. Culpepper*, 738 F.2d 1092, 1096–97 (10th Cir. 1984) (recognizing that fiduciary had a duty to represent client's best interests).

While Thomas Schaible attempts to limit the conduct at issue in this litigation to his compliance with Michael Schaible's March 31, 2017 transfer request and the subsequent liquidation of the Voya annuity, Plaintiff has presented evidence that Thomas Schaible's potential breaches of his fiduciary duties go much further.  For example, Plaintiff argues that breaches occurred when Thomas Schaible ignored her numerous inquiries about separating the couple's assets (ECF No. 148-24 at 2; ECF No. 165-13 at 2), and when he answered Michael Schaible's questions regarding liquidating the couple's assets and the resulting tax implications.  (ECF No. 165-12; ECF No. 165-16.)

There is also ample evidence suggesting that Thomas Schaible, aware of the couple's marital difficulties, disclosed Plaintiff's confidential information to his brother Michael Schaible, and actively aided Michael Schaible's attempts to liquidate funds from the couple's joint SSN brokerage account at Plaintiff's expense.  For example, Thomas Schaible forwarded Plaintiff's March 15 and March 22, 2017 e-mails to Michael Schaible on the same day that Michael Schaible instructed Thomas Schaible to transfer $2.5 million from his and Plaintiff's joint brokerage account to the First Bank of Vail bank account identified in the couple's written Standing Payment Instructions.  (ECF No. 148 at 8 ¶ 49; ECF No. 148-24; ECF No. 164 at 15 ¶ 78; ECF No. 165-13.)

When Plaintiff asked Thomas Schaible about the transactions that have occurred in the couple's accounts and re-affirmed her desire to have "50% of our cash, funds, and [V]oya and any other US stuff recognized individually" (ECF No. 165-19 at 10–11), Thomas Schaible did not inform her that Michael Schaible had already transferred $2.5 million from the account.  Instead, he: (1) forwarded the e-mail to Michael Schaible, writing, "Here we go…." (ECF No. 165-3); and (2) suggested to Plaintiff "not to head down the road of splitting everything up and legally separating or divorcing" (ECF No. 165-18 at 2).  Other e-mails further confirm that Thomas Schaible knew that Michael Schaible did not intend to evenly divide the couple's assets during the divorce settlement but that Thomas Schaible did nothing to look out for Plaintiff's interests.  (ECF No. 165-21 at 2.)  To the contrary, he sent e-mails to Michael Schaible and his divorce attorney in which he helped them strategize against Plaintiff in the couple's litigation proceedings.  (*See* ECF No. 165-24 at 2 (agreeing with a proposal that "[t]akes

away all of their arguments" and suggesting that "[w]e should bar [Plaintiff's counsel's brother] from being the new advisor for her.  Total conflict and loaded with problems.").)

Thus, Plaintiff has presented ample evidence that Thomas Schaible breached his fiduciary duties to Plaintiff by assisting Michael Schaible with the $2.5 million transfer from the couple's joint accounts *at Plaintiff's expense* and with full knowledge that Michael Schaible did not intend to evenly distribute his assets with Plaintiff.  *Cf. Leuzinger*, 396 S.W.2d at 576–77 ("if the stockbroker knows of facts and circumstances which would lead an ordinarily careful and diligent person to believe that one joint tenant of a joint brokerage account was in the process of wrongfully converting to his own uses and purposes the interest of the other joint tenant, a duty to inform the latter would arise, and in such case the broker would be derelict in disbursing the whole account to the joint tenant under suspicion, without first informing the other and obtaining consent and approval to the disbursement").

This portion of Thomas Schaible's Motion is therefore also denied.

3.    Liquidation of the Voya Annuity

Thomas Schaible further contends that he is entitled to summary judgment on Plaintiff's breach of fiduciary duty claim as to the January 18, 2018 liquidation of the Voya annuity because he "had already resigned as [P]laintiff's investment adviser at the time and did not owe [P]laintiff any fiduciary duties" and because he was not involved with the liquidation.  (ECF No. 148 at 31.)  He further contends that Michael Schaible contacted Voya directly to request a cash surrender of the Voya annuity, completed and submitted paperwork on his own to Voya, instructed Voya to deposit the liquidated funds to his bank account, and asked SRC employee Jennifer Bloodworth to notarize

his signature on the form, which she did without notifying Thomas Schaible.  (ECF No. 148 at 32.)  He argues that "[n]either [P]laintiff nor her expert can identify any evidence tying Schaible to the Voya liquidation."  (*Id.*)

However, even if Thomas Schaible was not involved with the formal liquidation of the Voya annuity on January 18 2018, he is still not entitled to summary judgment on this portion of Plaintiff's breach of fiduciary duty claim.  As explained above, there are material factual disputes about whether Thomas Schaible breached his fiduciary duties to Plaintiff by failing to act in Plaintiff's interests, and by assisting Michael Schaible in liquidating the Voya annuity at her expense.  Among other things, while Thomas Schaible ignored Plaintiff's questions regarding "separating our interest in terms of [V]oya mutual funds and cash" (ECF No. 165-13 at 2), in contrast he answered Michael Schaible's questions regarding the tax implications of liquidating the couple's assets, including the Voya annuity.  (ECF No. 164 at 13 ¶ 68; ECF No. 165-12; ECF No. 165-16.)  Moreover, despite being presented with evidence that Michael Schaible did not intend an even distribution of assets, Thomas Schaible did not alert Plaintiff or otherwise take any steps to protect her separate, individual interests.  (ECF No. 165-21 (In response to Michael Schaible's e-mail stating that "[a]ny division of cash or assets will be the result of divorce settlement in Mexico and it certainly will not include any even division of these funds," Thomas Schaible responds "[t]hought as much.").)  Thomas Schaible's subsequent resignation as Plaintiff's investment advisor does not eliminate the factual disputes regarding his earlier conduct.

Thus, this portion of the Motion is also denied.

**C.     SRC's Motion**

SRC argues that it is entitled to summary judgment on Plaintiff's breach of fiduciary duty claim for three reasons: (1) it did not owe Plaintiff fiduciary duties; (2) it could not have breached fiduciary duties it did not owe; and (3) its actions did not cause Plaintiff's damages because it did not carry out the transactions at issue.[7]

"A prerequisite to finding a fiduciary duty is the existence of a fiduciary relationship." *Moses v. Diocese of Colo.*, 863 P.2d 310, 321 (Colo. 1993) (en banc).  A fiduciary duty may arise between two parties when "one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation" or when one party occupies a superior position relative to another. *Id.* (quoting Restatement (Second) of Torts § 874 cmt. a (1979)).  While the existence of a professional relationship may be used as evidence that "one party has both the position and opportunity to influence the other party" such that a fiduciary exists, a fiduciary duty may also arise out of a relationship of blood, business, friendship or association." *Id.* at 321–22; *Dolton*, 642 P.2d at 23 (" . . . a fiduciary duty may arise from a business or confidential relationship which impels or induces one party to relax the care and vigilance it would and should have ordinarily exercised in dealing with a stranger.").

The existence of a fiduciary duty is a question of fact for the jury. *Moses*, 863 P.2d at 322; *Swan Global Invs., LLC v. Young*, 2019 WL 5095729, at *10 (D. Colo. Aug. 20, 2019); *see also Adams*, 718 P.2d at 516–17 (contrasting a broker who merely

---

[7] SRC further argues that Plaintiff is not entitled to exemplary damages.  (ECF No. 145 at 16–17.)  This portion of SRC's Motion is denied as moot because the Court has denied Plaintiff's request for leave to add a claim for exemplary damages.  (ECF Nos. 150, 205.)

receives and executes customer's orders to a different situation where "the customer almost invariably followed the broker's advice").

SRC argues that it is "engaged in the business of tax preparation and accounting" and that its services to Plaintiff were "limited to preparing her jointly filed federal tax returns until 2012, preparing her 2014 Colorado state tax return, and filling out the assets information on a 2014 mortgage application." (ECF No. 145 at 13.) According to SRC, "the accountant-client relationship is not a fiduciary one absent facts showing a special relationship of trust and confidence giving rise to some duty other than to adherence to professional standards" and, as such, it did not owe any fiduciary duties to Plaintiff. (*Id.* at 10–12.) It further argues that because it did not carry out either the $2.5 million transfer or the Voya liquidation, it did not cause Plaintiff's damages. (*Id.* at 14–16.)

Plaintiff argues that "the facts show . . . a special relationship between Thomas/SRC and Plaintiff" that give rise to a fiduciary duty. (ECF No. 164 at 25.) Plaintiff contends that Thomas Schaible served as Plaintiff's accountant, tax advisor, tax preparer, registered representative, broker, investment advisor, and financial advisor for decades, that he had specialized knowledge training and experience and superior expertise relative to Plaintiff, and that she placed her trust in him. (*Id.* at 25–26.) Finally, she argues that as a partner of a LLP, the duties and actions taken within the apparent usual course of SRC's business are SRC's duties and actions. (*Id.* at 31.)

These facts create a clear dispute about whether Thomas Schaible was Plaintiff's fiduciary. Moreover, the Court finds that there are material factual disputes regarding

whether any of Schaible's purported breaches of his fiduciary duties were taken within the usual course of SRC's business.

As explained in Part III.B.2, Plaintiff's breach of fiduciary duty claim goes beyond Thomas Schaible's limited actions in completing Michael Schaible's $2.5 million transfer request and the formal liquidation of the Voya annuity. The claim also includes the other actions that he took to Plaintiff's detriment, including ignoring her questions and failing to act in her best interests when he provided tax and investment advice to Michael Schaible regarding the transfers. Some of these actions, particularly providing tax advice to Michael Schaible, may be within the usual course of the SRC's business, and therefore may be attributable to SRC. *See Ball v. Carlson*, 641 P.2d 303, 305 (Colo. App. 1981) ("[t]he status of a partner, as both principal and agent of the partnership, serves as complete authority with respect to acts which are apparently within the usual course of the partnership's particular business, unless the other party knows that he has no such authority"); Colo. Rev. Stat. § 7-60-113 ("Where, by any wrongful act or omission of any partner acting in the ordinary course of the business of the partnership . . . , loss or injury is caused to any person, . . . the partnership is liable therefor to the same intent as the partner so acting or omitting to act").

For example, on March 13, 2017, Thomas Schaible sent Michael Schaible an e-mail explaining the potential tax implications from liquidating the Voya annuity. (ECF No. 165-12.) Thereafter, in response to Michael Schaible's questions about the potential resulting "tax hit" from liquidating all of his investment funds, Thomas Schaible advised his brother about how Michael Schaible could liquidate all of his assets to avoid taxes. (ECF No. 165-16.) All the while, Thomas Schaible advised Plaintiff not to file

any tax returns in her own name and to "seek the counseling you seem to need[,] not to head down the road of splitting everything up and legally separating or divorcing." (ECF Nos. 165-18; ECF No. 165-19.) Moreover, there is evidence that Thomas Schaible: (1) used his SRC e-mail address when corresponding with Plaintiff and Michael Schaible; (2) conducted his investment advisory business out of SRC's offices; and (3) that SRC maintained both the investment files and tax files for Plaintiff and Michael Schaible. (ECF No. 164 at 10 ¶¶ 42–44, 46.)

Accordingly, on this record, the Court finds that there are material factual disputes regarding which, if any, of Thomas Schaible's purported breaches of his fiduciary duties are attributable to SRC.

SRC's Motion is therefore denied.

## II. 702 Motion

### A.    Standard of Review

A district court must act as a "gatekeeper" in admitting or excluding expert testimony. *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232 (10th Cir. 2005). Expert opinion testimony is admissible if it is relevant and reliable. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589, 594–95 (1993). The opinions are relevant if they would "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. They are reliable if (1) the expert is qualified "by knowledge, skill, experience, training, or education," (2) his opinions are "based upon sufficient facts or data," and (3) they are "the product of reliable principles and methods." *Id.* The proponent of expert testimony has the burden to show that the testimony is admissible. *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009).

In addition to assessing whether expert opinions are reliable, the Court must also ensure that the proffered testimony will assist a trier of fact.  *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 156 (1999).  "Relevant expert testimony must logically advance[ ] a material aspect of the case and be sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."  *United States v. Garcia*, 635 F.3d 472, 476 (10th Cir. 2011) (internal quotation marks and citations omitted).  Moreover, an expert witness's testimony may not usurp the jury's fact-finding function.  *See Specht v. Jensen*, 853 F.2d 805, 809–10 (10th Cir. 1988).  The line between what is helpful to the jury and what intrudes on the jury's role as the finder of fact is not always clear, but it is well-settled that "[a]n opinion is not objectionable just because it embraces an ultimate issue."  Fed. R. Evid. 704.  Nonetheless, "[t]here is a significant difference between an attorney who states his belief of what law should govern the case and any other expert witness.  While other experts may aid a jury by rendering opinions on ultimate issues, our system reserves to the trial judge the role of adjudicating the law for the benefit of the jury."  *Specht*, 853 F.2d at 808–09.

**B.    Analysis**

In his 702 Motion, Thomas Schaible seeks to exclude the following opinions from Plaintiff's expert, William Fender:

- Thomas Schaible had a fiduciary duty to contact [Plaintiff] before executing Michael Schaible's withdrawal order from their joint account pursuant to written standing account instructions on March 31, 2017;

- Thomas Schaible should have abstained from executing Michael Schaible's March 31, 2017 withdrawal request;

- Thomas Schaible had a duty to advise [Plaintiff]to liquidate and distribute the couple's joint account holdings, including the Voya annuity, prior to

March 2017;

- Thomas Schaible filed an inaccurate affidavit in connection with his brother's divorce and provided false deposition testimony in this case

- Thomas Schaible breached his fiduciary duty with respect to the Voya annuity which Michael Schaible liquidated in 2018;

- Thomas Schaible breached his common law fiduciary duties under Colorado law;

- Thomas Schaible's fiduciary obligation as a registered investment adviser applied to the execution of Michael [Schaible's] cash withdrawal request from his brokerage account with SSN;

- There were numerous "red flags" which counselled caution in heeding his customer's withdrawal request; and

- Thomas Schaible had a fiduciary obligation to respond to each of Dianna's numerous emails, including personal emails.

(ECF No. 178 at 2; ECF No. 178-5.)  The Court will consider each of Thomas Schaible's arguments in turn.

      1.    <u>Fender's Expertise & General Acceptance of His Opinions</u>

Thomas Schaible argues that "[w]hile [Fender] is a licensed Registered Investment Adviser, he is not a licensed registered representative with FINRA, and is not familiar with the securities regulations which govern broker-dealers" and is "not qualified to testify about the standards applicable to a broker dealer or at common law." (ECF No. 178 at 9–10.)

He further contends that "Fender's report cites insufficient authority to support his conclusions as to purported conflicts of interest or breaches of fiduciary duty by [Thomas] Schaible." (ECF No. 178 at 3.)  For example, he contends that Fender cites "no specific securities regulation, enforcement action, treatise, regulatory notice, article

or work of scholarship to support his primary position that Thomas Schaible breached his fiduciary duty by honoring the request of one joint account holder to withdraw less than one half of the balance of a joint account and wiring it to another joint account pursuant to the parties' written standing account instructions." (*Id.* at 3–4.) He further points out that "Fender admitted at his deposition that his views are his own" and that "there is no indication that Mr. Fender's techniques or opinions are widely accepted in the investment advisor or financial services community." (*Id.* at 5.)

In response, Plaintiff argues that "Fender does not need to be a FINRA representative to provide relevant testimony relating to the fiduciary duties owed by an investment adviser." (ECF No. 198 at 4–5.) She further argues that Fender, who has 24 years of experience as an investment adviser representative and 18 years of experience as a Chief Complaint Officer of an investment adviser registered with the SEC, is reliable. (*Id.* at 8.) Moreover, according to Plaintiff, "Fender's opinions are not based solely on the general principles of fiduciary duties owed by investment advisers, but those principles *applied* to the Defendant's actions and/or inactions toward Plaintiff." (*Id.* at 4 (emphasis in original).)

To be admissible, expert testimony must have a "reliable basis in the knowledge and experience of [the relevant] discipline." *Kumho Tire Co., Ltd.*, 526 U.S. at 149 (quoting *Daubert*, 509 U.S. at 592). The goal of this gatekeeping requirement is to ensure that "an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152. However, Rule

702 does not create a "schematism that segregates experience by type while mapping certain kinds of questions to certain kinds of experts."  *Id.* at 151.

In determining whether an expert is qualified, the Tenth Circuit has recognized that an expert "should not be required to satisfy an overly narrow test of his own qualifications."  *Gardner v. Gen. Motors Corp.*, 507 F.2d 525, 528 (10th Cir. 1974). Here, the Court finds that based on Fender's substantial industry experience, he is qualified to opine on the matters at issue in this litigation.

Moreover, while Fender has not supported his opinions with the specific secondary sources identified by Thomas Schaible, the Court cannot conclude that Fender's opinions must be excluded on the basis that his opinions are not generally accepted by the community.  Fender's expert report demonstrates that he has reviewed numerous other authorities in developing his expert opinions in this case, including statutes, studies, speeches, and other publications.  (*See* ECF No. 178-5.) Furthermore, the facts of this case are quite unique.  As the Supreme Court recognized in *Kumho Tire Co.*, "[i]t might not be surprising in a particular case, for example, that a claim made by a scientific witness has never been the subject of peer review, for the particular application at issue may never previously have interested any scientist."  526 U.S. at 151.

In sum, Thomas Schaible's objections to Fender's qualifications and opinions go more to the weight of his expertise and opinions, and any perceived insufficiencies in his opinions or qualifications may be adequately addressed on vigorous cross examination.  Thus, this portion of the 702 Motion is denied.

2.      Opinions Regarding Issues Reserved for the Jury

Thomas Schaible further argues that Fender's report intrudes upon issues that are properly before the jury, including: (1) opining about whether Thomas Schaible's conduct violated his fiduciary duty to his clients; and (2) opining on Thomas Schaible's credibility.  (ECF No. 178 at 9.)

To the extent Fender's opinions reach ultimate conclusions regarding the essential elements of Plaintiff's claim that Thomas Schaible breached his fiduciary duties owed to Plaintiff, those opinions are properly excluded.  *See Specht*, 853 F.2d at 808.  However, the line between what is helpful to the jury and what intrudes on the jury's role as the finder of fact is not always clear, but "[a]n opinion is not objectionable just because it embraces an ultimate issue."  Fed. R. Evid. 704(a).

Of course, Fender may testify about Thomas Schaible's actions from the perspective of industry standards and practices.  However, neither Thomas Schaible nor any other witness may testify at trial as to any ultimate conclusions regarding the essential elements of Plaintiff's breach of fiduciary duty claim, such as opining on whether Thomas Schaible breached his fiduciary duties.  *See, e.g.*, *United States v. Oles*, 994 F.2d 1519, 1522–23 (10th Cir. 1993) ("[T]estimony which articulates and applies the relevant law . . . circumvents the jury's decision-making function by telling it how to decide the case." (quoting *Specht*, 853 F.2d at 808)); *United States v. Jensen*, 608 F.2d 1349, 1356 (10th Cir. 1979) ("[A]n expert witness cannot state legal conclusions by applying law to the facts, passing upon weight or credibility of the evidence, or usurping the province of the jury by telling it what result should be reached."); *cf. Zuchel v. City & Cnty. of Denver*, 997 F.2d 730, 742–43 (10th Cir. 1993)

(affirming admission of testimony by police practices expert who "did not give an opinion on whether [the officer's] conduct was unconstitutional.  Rather, he stated his belief that the conduct was inappropriate based on [his] understanding of generally accepted police custom and practice in Colorado and throughout the United States.").

Moreover, the Court will not permit Fender to offer an opinion regarding the credibility of any party or witness in this case.  As the Tenth Circuit has recognized, "[e]xpert testimony which does nothing but vouch for the credibility of another witness encroaches upon the jury's vital and exclusive function to make credibility determinations, and therefore does not assist the trier of fact as required by Rule 702." *United States v. Adams*, 271 F.3d 1236, 1245 (10th Cir. 2001).

Accordingly, the Motion is granted to the extent stated herein.

### IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.  Defendant Schaible, Russo & Company, C.P.A.'s LLP's ("SRC") Motion for Summary Judgment (ECF No. 147) is DENIED;

2.  Defendant Thomas Schaible's Motion for Summary Judgment (ECF No. 149) is DENIED; and

3.  Defendant Thomas Schaible's Motion to Exclude Testimony of Plaintiff's Expert Witness William Fender (ECF No. 181) is GRANTED IN PART and DENIED IN PART as set forth herein.

Dated this 2nd day of September, 2021.

BY THE COURT:

William J. Martinez
United States District Judge